WOODELL et al., Appellants,

v.

ORMET PRIMARY ALUMINUM CORPORATION et al., Appellees.

[Cite as *Woodell v. Ormet Primary Aluminum Corp.*, 156 Ohio App.3d 602, 2004-Ohio-1558.]

Court of Appeals of Ohio,
Seventh District, Monroe County.

No. 03MO7.

Decided March 24, 2004.

Daniel Klos, for appellants.

Richard Yoss;  Thomas Smock and Michael Glass, for Ormet Primary Aluminum Corp.

Melvin Stein and Theresa Merrill;  Timothy Cogan and Patrick Cassidy, for United Steelworkers of America.

VUKOVICH, Judge.

{¶ 1} Plaintiff-appellant Jeff Woodell appeals from the judgment of the Monroe County Common Pleas Court granting summary judgment in favor of defendants-appellees Ormet Primary Aluminum Corporation, R. Emmett Boyle, Gary Mallet, Greg Driscoll, Roy Schweinsburg, Chuck Rogalski, and John Doe Management Employees (collectively referred to as "Ormet").  Woodell is also appealing from the trial court's grant of summary judgment in favor of defendants-appellees

United Steelworkers of America, AFL–CIO–CLC, United Steelworkers of America, District 1, United Steelworkers of America, Local Union 5724, David McCall, Kenny Cozart, Terry Bratton, Ronnie Blatt, Donnie Blatt, and Bill Brooks (collectively referred to as "Union"). As to Ormet, this court is asked to determine whether Woodell established the elements of employer intentional tort and wrongful discharge. As to the Union, this court is asked to decide whether statements and actions taken by Union employees were condoned by the Union and thus constituted actionable negligence on the part of the Union. For the reasons stated below, the trial court's grant of summary judgment for the Union is hereby affirmed. However, all issues raised against Ormet are stayed pending bankruptcy.

## STATEMENT OF FACTS

{¶ 2} Ormet is a large corporation that operates an aluminum smelter in Monroe County, Ohio. The Union is the collective bargaining representative of Ormet's product and maintenance employees. Boyle, Mallet, Driscoll, Schweinsburg, and Rogalski are all upper-level management at Ormet. McCall, Cozart, Bratton, Ronnie Blatt, Donnie Blatt, and Brooks are representatives and/or members of the Union.

{¶ 3} In May 1999, Ormet and the Union began having problems related to the collective bargaining agreement, which had expired. In an attempt to get the terms of the contract that they wanted, the Union members engaged in chanting while entering and exiting the plant (sometimes referred to as "in plant" strategy), placing signs at the entrance of the plant, and writing graffiti on Ormet property. The language used in the chants, signs, and graffiti that referred to the labor dispute were "COLA," "Pension," and "Fair Contract." However, some of the chanting, signs, and graffiti were directed toward individual salaried employees.

{¶ 4} Woodell was employed by Ormet as a front-line supervisor from August 1996 until his termination in July 2001. During the time of the labor dispute, Woodell was a pot-line supervisor on C shift. As a pot-line supervisor, he was a low-level salary employee and, as such, was not a member of the Union but was required to work closely with hourly Union employees. Woodell was one of the salaried employees towards whom chants, signs, and graffiti were directed.

{¶ 5} The chants, signs, and graffiti referred to Woodell personally and sometimes involved his family. For example, the Union employees chanted, "Woodell must go" and "One day Woodell will pay." Also, graffiti in the plant stated, "The only good Woodell is a dead Woodell." "Match in the gas tank, boom, boom Woodell." "Woodell's wife takes it up the ass from Roy while Rogalski watches." (Roy and Rogalski are upper level management.) "Jenny's

pussy stinks." (Jenny is Woodell's wife.) "Hey, Woodell, who is the daddy" (referring to who is the father of his toddler son). "Young Woodell says mom sucks good cock while dad is at work." And "Shoot Woodell." The signs posted at the entrance of the plant stated, "Woodell is a disease—5724 is the cure" (5724 is the local union number). Another sign posted at the entrance of the plant stated "your move pizza man." (Woodell ran a pizza shop in town.)

{¶ 6} Besides the chanting, graffiti, and signs, Woodell asserts that four confrontations occurred between him and the hourly employees. One occurred between Woodell and Brooks where Brooks drove closely behind Woodell with a hot metal truck. Two of the other incidents were when a large group of employees followed and chanted at Woodell. The last confrontation occurred on April 3, 2000, when a group of hourly employees congregated in the area around the shower room. Upon Woodell's approach to the shower room, the group of hourly employees were chanting and coming towards him. Two other supervisors came upon Woodell and helped him exit the area before any physical contact occurred between the hourly employees and Woodell. Three employees were terminated for their conduct; however, they were reinstated within three weeks of the termination.

{¶ 7} Because of all of these occurrences, Woodell began to miss work due to the physical effect the stress of the labor dispute was having on him. Woodell asked to be moved to another job, but Ormet could move him only to another shift and pot line. Woodell refused this option. Due to the stress and the physical effects the labor dispute was having on him, on May 5, 2000, Woodell took a leave of absence from his job. Woodell began seeing doctors and was diagnosed with post-traumatic stress disorder ("PTSD").

{¶ 8} The labor dispute was resolved at the end of May 2000, with a new contract being signed between Ormet and the Union. Ormet began looking into whether Woodell could return to work in January 2001, after a report was made that he was working in the pizza shop that he owned. Ormet then ordered an independent medical examination ("IME"). The IME concluded that Woodell was well enough to return to work. Following this recommendation, Ormet ordered Woodell to report back to work on July 23, 2001. Woodell consulted with his own doctor prior to reporting to work and was informed that he was not well enough to work. Following his doctor's recommendation, Woodell reported off and then was terminated from his employment with Ormet.

{¶ 9} In April 2001, Woodell filed suit against Ormet and the Union, asserting six causes of action. The causes of action asserted against Ormet that are at issue in this appeal are the employer intentional tort cause of action, the public-policy tort cause of action, and a claim of spoliation of evidence. The cause of action asserted against the Union sounds in tort for the activities of it and its

members that were allegedly intended to cause injury to Woodell. After discovery, the Union and Ormet filed motions for summary judgment. The trial court granted the motions on all counts. Woodell timely appeals from that decision, raising one assignment of error.

## ASSIGNMENT OF ERROR

{¶ 10} Woodell fails to comply with App.R. 16(A)(3) in that Woodell's brief contains no assignment of error. However, from the brief it can be concluded that Woodell believes that the trial court erred in granting summary judgment for Ormet and the Union.

{¶ 11} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 671 N.E.2d 241. Summary judgment is properly granted when (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to only one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C). The evidence must be viewed in the light most favorable to the nonmoving party. If a movant desires to obtain summary judgment, it should point the court towards the portions of the record, which can include pleadings that demonstrate the absence of a genuine issue for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. To avoid summary judgment, the nonmovant cannot rest on the mere allegations of the pleadings but must set forth specific facts by affidavit or otherwise showing a genuine issue for trial. Id. For simplicity purposes, the grant of summary judgment for each appellee is addressed separately.

## ORMET

{¶ 12} On February 6, 2004, this court was informed by Ormet Primary Aluminum Corporation that it had filed bankruptcy under Chapter 11 of the United States Code. Federal law mandates a stay in all further judicial proceedings until the bankruptcy dispute is resolved. Section 362(a), Title II, U.S.Code (stating a petition for bankruptcy "operates as a stay, applicable to all entities, of— (1) the commencement or continuation * * * of a judicial * * * proceeding against the debtor that was [or could have been] commenced before the commencement of the case under this title"); *Markey Bronze Corp. v. Hoffman* (May 18, 1984), 6th Dist. No. F–83–12, 1984 WL 7884. Thus, due to Ormet Primary Aluminum Corporation's filing for bankruptcy, we must stay the execution of the appeal as to the issues raised against it, i.e., employer intentional tort cause of action, public-policy tort cause of action, spoliation of evidence claim, trial court's denial of Woodell's motion to amend the complaint to assert another

cause of action against Ormet, and the trial court's award of costs to Ormet. Any action or decision issued by this court as to Ormet Primary Aluminum Corporation would be in violation of the stay and, thus, void and a nullity. *Harvard Mfg. Co. v. Security Pacific Business Credit (Ohio), Inc.* (Oct. 23, 1986), 8th Dist. No. 51167, 1986 WL 11962.

{¶ 13} In addition to Ormet Primary Aluminum Corporation, the automatic stay provision is also applicable to all management employees that were named in the complaint and in this appeal. While Woodell sued these management employees of Ormet Primary Aluminum Corporation in both their "representative" and individual capacities, it is clear from the record that he has advanced no theories (to the trial court or this court) against these employees as individuals. Rather, every cause of action and argument that involves them revolves solely around their status as Ormet Primary Aluminum Corporation employees. Thus, the causes of action and arguments asserted against these management employees are in actuality being asserted against Ormet Primary Aluminum Corporation. Therefore, the stay provision is equally applicable to any decision we would render as to these individuals.

{¶ 14} However, the automatic stay provision does not affect our ability to address the issues concerning the Union. The automatic stay provision generally extends only to the debtor, i.e., Ormet, who has filed bankruptcy proceedings, not to other non-bankrupt co-defendants or co-appellees, i.e., the Union. *Chronister v. Scores of Mansfield, Inc.*, 5th Dist. No. 02–CA–85, 2003-Ohio-5593, 2003 WL 22390014, at ¶ 9. In certain limited situations, when there is sufficient identity of interest between bankrupt and non-bankrupt parties, a Section 362 stay may apply to actions against non-bankrupt defendants. See *Carpet Gallery of Akron, Inc. v. Bloniarz*, 9th Dist. No. 20849, 2002-Ohio-3737, 2002 WL 1625863; *Sowell v. United Cos. Lending Corp.* (July 27, 2000), 8th Dist. No. 76389, 2000 WL 1036239. This is not one of those limited situations and, thus, Woodell's arguments as to the Union are addressed below.

## UNION

{¶ 15} Woodell asserted that the Union authorized the action of its members that allegedly caused injury to him. The trial court held that the comments and conduct at issue were not actionable under federal law. Furthermore, the court held that Woodell failed to provide clear proof that the Union defendants were responsible for the acts that caused the injury.

{¶ 16} The National Labor Relations Act ("NLRA") Section 7 guarantees employees the right to engage in "concerted activities for the purpose of

collective bargaining or other mutual aid or protection." Therefore, the threshold question under NLRA Section 7 is whether an employee's activity is "concerted."

{¶ 17} Any action by two or more employees may constitute concerted activity if it relates to group action in the interest of employees. *Supreme Optical Co. v. Natl. Labor Relations Bd.* (C.A.6, 1980), 628 F.2d 1262. However, not all concerted activity is protected under Section 7. *Natl. Labor Relations Bd. v. Leslie Metal Arts Co., Inc.* (C.A.6, 1975), 509 F.2d 811, 813. Protected activity must in some fashion involve employees' relations with their employer and thus constitute a manifestation of a "labor dispute." Id. When employee activity, however, is directed at circumstances other than conditions of employment, it is outside the protection of Section 7. Id., citing *Joanna Cotton Mills Co. v. Natl. Labor Relations Bd.* (C.A.4, 1949), 176 F.2d 749 (holding that circulation of a petition by an employee for the removal of a foreman against whom the employee held a personal grudge was not protected activity); *AHI Machine Tool & Die, Inc. v. Natl. Labor Relations Bd.* (C.A.6, 1970), 432 F.2d 190 (holding that a walkout in protest of the discharge of a fellow employee who had "violently and unlawfully slugged a supervisor" was unprotected activity); *Cleaver–Brooks Mfg. Corp. v. Natl. Labor Relations Bd.* (C.A.7, 1959), 264 F.2d 637 (holding that a strike protesting the replacement of a supervisor where the evidence showed the strike to be based on mere personal antipathy toward a new foreman was unprotected activity).

{¶ 18} If the acts are not protected or are unlawful under Section 7, the accuser must establish by clear proof that the union or its officer authorized, participated, or condoned such acts. The "clear proof" test has been adopted by the state courts, including this one, when determining whether a union or its officers are liable for the non-protected acts of its members. *Calex Corp. v. United Steelworkers of Am.* (2000), 137 Ohio App.3d 74, 81–82, 738 N.E.2d 51. As was explained in *Calex:*

{¶ 19} "Clear proof is that which is unequivocal and convincing. [Citations omitted] It requires more than merely persuading the trier of fact by the preponderance of the evidence. [Citations omitted] It thus follows that the plaintiff has the burden to persuade the trier of fact by a substantial margin that the union, officer, or the individual member charged[,] authorized, participated in or ratified the damaging conduct of its members." Id., 137 Ohio App.3d at 82, 738 N.E.2d 51.

{¶ 20} Under the above law, for the activity to be protected there must be a labor dispute and the employee's conduct must be directed at the employment conditions. First, there is no dispute that the conduct arose from a labor dispute. As such, that element is met. Therefore, our analysis turns to whether the

conduct arose apart from the employment conditions. If the conduct arose apart from the employment conditions, then we must determine whether Woodell provided clear proof that the Union or its officers authorized such conduct.

{¶ 21} As the Union's brief correctly points out, Woodell's cause of action is predicated on three groups of activities. The first is chants uttered by the employees. The second is the graffiti directed at Woodell and his family. The third is four nonphysical confrontations that occurred.

## CHANTS

{¶ 22} The chants at issue are: "Woodell must go"; "Fuck you—Kill Him"; and "Bullshit Woodell must go."

{¶ 23} The Union argues that the chants "Woodell must go" and "Bullshit Woodell must go" are preempted. The Union insists that these chants can only be interpreted to mean that the Union wanted Woodell fired from his supervisory position at Ormet. Woodell even admitted that this was his interpretation of this chant.

{¶ 24} Our analysis begins with the question of the whether the speech is protected under Section 7 of the NLRA. *Sheridan v. Internatl. Bhd. of Electrical Workers* (Mass.1996), 945 F.Supp. 12, 16 (explaining that when an activity is arguably subject to Section 7 or Section 8 of the NLRA, "the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with nation policy is to be averted"); *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 244–246, 79 S.Ct. 773, 3 L.Ed.2d 775. The Union contends that these chants could be seen as the Union's assertion that Woodell, as a supervisor, was going to be a term of the collective bargaining agreement and, thus, are protected under the NLRA.

{¶ 25} While the chant may indicate that Union employees wanted Woodell fired, it is a stretch to imply that the Union intended to make Woodell personally a term of the collective bargaining agreement. Chanting when entering or exiting the plant would, if sufficiently related to employment conditions, be protected under Section 7. Clearly, chants concerning "COLA" and "Pension" are protected.

{¶ 26} Additionally, the chants that "Woodell must go" are arguably protected. These chants could be considered related to employment conditions. Donald Blatt, chairman of the grievance committee for the local Union, who participated in the chants "Woodell must go," stated that the chant was intended to bring the discipline issue to the attention of the company. He explained that Woodell had disciplined some employees and that the Union disagreed with the discipline. He further explained that discipline was a contract issue for the

Union. The use of "must go" with the name of the supervisor indicated that discipline was an issue for the contract negotiations. Thus, the chants were protected concerted activities because the activities *might reasonably* be seen as affecting terms or conditions of employment. *State Emp. Relations Bd. v. Union Twp. Trustees* (2001), 142 Ohio App.3d 199, 208, 755 N.E.2d 369, citing *Natl. Labor Relations Bd. v. Mike Yurosek & Son, Inc.* (C.A.9, 1995), 53 F.3d 261, 266. Consequently, in this situation, the chants as to "Woodell must go" and "Bullshit Woodell must go" were protected activity.

{¶ 27} Regarding the other chant, "Fuck You—Kill Him," this chant clearly is not related to the terms or conditions of employment, thus it is not protected under Section 7. However, Woodell provided no support that the Union authorized or condoned this chant. Donald Blatt stated that the Union would not have condoned this type of personal attack. David McCall, District Director for District 1, United Steelworkers of America, stated that it would have been inappropriate for Union employees to make personal attacks on management employees and that the Union's focus was on targeting the company, not its management employees. Moreover, from the chant alone it is unclear that this statement is directed at Woodell. For these reasons, this argument fails.

## GRAFFITI

{¶ 28} As aforementioned, the graffiti at issue are: "Jenny's pussy stinks," "The only good Woodell is a dead Woodell," "Match in the gas tank, boom, boom Woodell," "Woodell's wife takes it up the ass from Roy while Rogalski watches," "Hey Woodell who is the daddy," "Shoot Woodell," and "Young Woodell says mom sucks good cock while dad is at work."

{¶ 29} To determine whether this language is protected, the question becomes whether the employees' actions of writing these graffiti are sufficiently related to their "interest as employees" to come within the mutual aid or protection clause of Section 7. *Union,* 142 Ohio App.3d at 208, 755 N.E.2d 369, citing *Squier Distrib. Co. v. Local 7, Internatl. Bhd. of Teamsters* (C.A.6, 1986), 801 F.2d 238, 240–241. As stated above, concerted activities are protected if the activities might reasonably be seen as affecting the terms or conditions of employment. *Union,* 142 Ohio App.3d at 208, 755 N.E.2d 369, citing *Mike Yurosek & Son, Inc.,* 53 F.3d at 266.

{¶ 30} Case law states that labor disputes often involve exaggerated rhetoric and that protected speech in these situations includes "vehement, caustic, and sometimes unpleasantly sharp attacks." *Gilbrook v. Westminster* (C.A.9, 1999), 177 F.3d 839, 863, citing *Old Dominion Branch No. 496 v. Austin* (1974), 418 U.S. 264, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745. During labor disputes, a reasonable

audience would expect rhetorical speech. *Leidholdt v. L.F.P, Inc.* (C.A.9, 1988), 860 F.2d 890, 893.

{¶ 31} The Union contends that the graffiti were published in the context of an in-plant campaign of concerted activity attendant to the ongoing negotiations and, therefore, were protected. However, despite this contention, it is hard to see how statements made about Woodell's wife and family are in any way protected, since the graffiti and their contents are in no way related to the labor dispute. The above-referenced graffiti can easily and accurately be described as vehement and an offensively sharp attack. They do not in any remote way concern the terms or conditions of employment. Rather, they are scandalous and offensive personal attacks on Woodell and his family. Thus, these graffiti were clearly an unprotected activity.

{¶ 32} However, the analysis cannot stop at this point. It must still be determined whether Woodell established by clear proof that the Union or its officers authorized these graffiti. Here, the fatal flaw in appellant's position is the fact that no one was able to identify any individual member of the Union who wrote these statements. Without the ability to identify who wrote the graffiti, Woodell fails to provide clear proof that the Union, its officers, or any of its individual members authorized this conduct. *James R. Snyder Co. v. Edward Rose & Sons, Inc.* (C.A.6, 1976), 546 F.2d 206; *Calex*, 137 Ohio App.3d at 82, 738 N.E.2d 51. Woodell admitted in the depositions that he had no evidence that the Union directed its members to write graffiti about him or that the Union at any level even condoned this activity. Furthermore, McCall stated that targeting any specific management employee or their family members would be inappropriate and that he would not have advised that. (McCall Depo. 105, 108.) This indicates that at least the United Steelworkers of America did not condone this activity.

{¶ 33} While it is true that the graffiti occurred inside the plant where typically only hourly employees (which it appears were all Union) and supervisors would have access, this does not automatically mean that the Union or its officers authorized or condoned the graffiti. Without providing clear proof, the motion for summary judgment against all Union defendants was proper. Thus, this argument is meritless.

## CONFRONTATIONS

{¶ 34} The confrontations at issue are an incident where Bill Brooks, a member of the Negotiating Committee, drove closely behind Woodell, trying allegedly to run him over with a hot metal truck; an incident where Union members converged upon him in the gatehouse and called him to come out; an incident

where Union members were chanting at Woodell; and an incident where Union members congregated at the entrance of the facility to, as he explains, either verbally or physically assault him. Woodell argues that none of these incidents is protected under Section 7 of the NLRA.

{¶ 35} The Union argues that the conduct Woodell complains of did not carry an immediate threat and, as such, did not fall outside a protected activity. In support of this contention, the Union references Woodell's own statements during the deposition, in which he stated that no employee ever came closer than five feet from him, that no one struck him or exhibited a firearm or knife to him, and that he was never beaten, slapped, or touched by any employee.

{¶ 36} In order for conduct to lose its protected status, it must be more than merely insulting; it must carry with it an immediate threat. *Yeager v. Local Union 20, Teamsters* (1983), 6 Ohio St.3d 369, 375, 453 N.E.2d 666. The above conduct of chanting at him and calling him out does not appear to carry an immediate threat. The chants concerning Woodell must go, as stated above, were within the context of the labor dispute.

{¶ 37} Regarding the incident with the hot metal truck, Woodell testified that it did not come closer than two to three feet from him. However, closely following a person with a hot metal truck may be an immediate threat and not just mere insult, indignities, annoyances, petty oppression, or other trivialities (which are protected). The dangerousness of this conduct is obvious. Thus, this conduct did not fall within the context of the labor dispute.

{¶ 38} However, Woodell failed to establish by clear evidence that the Union authorized or condoned the activity. There is no indication in the record that the Brooks incident was ever condoned by the Union. An employee's action cannot be automatically attributed to the Union. *N. Am. Coal Corp. v. United Mine Workers* (C.A.6, 1974), 497 F.2d 459. Therefore, this argument also fails.

## ASSESSMENT OF COSTS AGAINST WOODELL

{¶ 39} Civ.R. 54(D) states:

{¶ 40} "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs."

{¶ 41} "Costs" under Civ.R. 54 do not include deposition costs but only those statutory fees to which officers, jurors, witnesses, and others are entitled for their service, in an action. *Carr v. Lunney* (1995), 104 Ohio App.3d 139, 661 N.E.2d 246. This court will not reverse a lower court's assessment of costs absent an abuse of discretion. *Keaton v. Pike Community Hosp.* (1997), 124 Ohio App.3d 153, 156, 705 N.E.2d 734.

{¶ 42} Woodell argues that it was within his rights to bring this cause of action against Ormet and the Union. He contends that the action was not a frivolous suit meant to harass appellees or to waste their time and resources. He also states that the trial court acknowledged that he had "endured horrific verbal abuse and insulting graffiti aimed not only at himself but his wife and family." He contends that given the nature of this case and the extent of discovery, it was arbitrary, unreasonable, and unconscionable for him to "bear the full brunt of the court costs associated with prosecuting this action."

{¶ 43} As explained above, even though Woodell raises this issue as to Ormet and the Union, due to the stay we are authorized to enter an opinion only as to the Union. That said, we find no abuse of discretion in the trial court's order for Woodell, and not the Union, to pay court costs. While the trial court correctly stated that Woodell endured horrific verbal abuse and that he was entitled to bring his cause of action, those facts alone do not make the trial court's decision to assess the costs against him an abuse of discretion. Thus, without more, we cannot conclude that the trial court abused its discretion in assessing costs against Woodell. This argument lacks merit.

{¶ 44} For the foregoing reasons, the judgment of the trial court is hereby affirmed. The grant of summary judgment for the Union is affirmed. The trial court did not abuse its discretion in assessing costs against Woodell. Any issues raised in this appeal as to Ormet are stayed pending bankruptcy.

Judgment accordingly.

WAITE, P.J., and GENE DONOFRIO, J., concur.